# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

LAW TANNING CO., LLC,
        Plaintiff,

v.                                                    Case No. 17-C-1703

WESTFIELD INSURANCE COMPANY,
        Defendant.

## DECISION AND ORDER

Law Tanning Company, LLC, commenced this action in Wisconsin state court against Westfield Insurance Company. It alleges that Westfield breached its duty to pay Law Tanning for losses it sustained as a result of an embezzlement scheme perpetrated by one of its employees. Westfield removed the case to federal court under the diversity jurisdiction, 28 U.S.C. § 1332, and filed a counterclaim against Law Tanning. Before me now are the parties' cross-motions for summary judgment on the issue of whether Law Tanning is entitled to coverage.

## I. BACKGROUND

Law Tanning operates a small tanning business in Milwaukee, Wisconsin. In June 2017, it discovered that its longtime office manager, Randy Draeger, had been stealing from it by writing unauthorized checks to himself on the company's account. Over the course of 17 years, Draeger had written approximately 1,940 checks to himself. The total amount he stole exceeded $2.8 million.

At the time that Law Tanning discovered Draeger's scheme, it had commercial-crime insurance through Westfield that covered employee theft. The policy in force at

1

the time of the discovery had a policy period that ran from August 31, 2016 to August 31, 2017. Westfield also issued Law Tanning an identical policy for the prior policy period, August 31, 2015 to August 31, 2016. The policy limit for employee theft under each policy was $25,000 with no deductible.

Upon discovering Draeger's scheme, Law Tanning terminated him and filed a claim with Westfield. In its claim to Westfield, Law Tanning reported that, between August 31, 2015 and June 2017, Dragger had written checks to himself totaling $568,226.69 and that, between April 2000 and August 31, 2015, Draeger had written checks to himself totaling $2,281,884.31. Law Tanning also advised Westfield that Draeger had repaid $711,840.70 to Law Tanning by surrendering the funds in his company 401(k) account, and that therefore its total loss was $2,138,270.30.

In response to Law Tanning's claim, Westfield determined that Draeger's entire scheme was a single "occurrence" within the meaning of the policy and that therefore the most Law Tanning could receive under the policy was $25,000, the per-occurrence policy limit. Law Tanning disagreed with this determination. It took the position that every check that Draeger wrote to himself qualified as a separate "occurrence." Because Draeger never wrote a check greater than $25,000, Law Tanning believed that the policy limit did not apply to its claim.

Under Law Tanning's theory that every check qualified as a separate occurrence, Law Tanning could only claim the losses that it sustained between August 31, 2015 and August 31, 2017, which was the period within which Westfield's policies were in force. During this period, Draeger wrote 173 illegal checks to himself, totaling $568,226.69. The remainder of the theft occurred prior to August 31, 2015, when Law Tanning was

2

not insured by Westfield. The insurer immediately preceding Westfield was Frankenmuth Mutual Insurance Company. Law Tanning's policies with Frankenmuth did not include coverage for employee theft. However, in its claim to Westfield, Law Tanning argued that certain provisions of Westfield's policy required it to pay for losses sustained because of employee theft that occurred during the Frankenmuth policy periods. Thus, Law Tanning believed that Westfield was required to reimburse it for the entire loss sustained between April 2000 and August 31, 2015.

After Law Tanning exchanged letters with Westfield regarding its claim, but before Westfield made a formal coverage decision, Law Tanning commenced this action to establish coverage under the policy. Westfield filed a counterclaim seeking a declaratory judgment establishing that it has no obligation to indemnify Law Tanning beyond the $25,000 policy limit. Westfield's counterclaim also alleges that Law Tanning breached the policy by failing to cooperate with Westfield's investigation into the claim and prematurely commencing this lawsuit. As an affirmative defense, Westfield alleges that it is entitled to a set-off in the amount that Draeger repaid Law Tanning following the discovery of his theft.

The parties have filed cross-motions for summary judgment. In its motion, Westfield contends that Law Tanning cannot recover more than $25,000 because its entire loss was caused by a single occurrence, to which the policy limit of $25,000 applies. However, Westfield also contends that Law Tanning is not entitled to recover even this amount. Here, Westfield notes that Draeger repaid Law Tanning more than he

stole during the Westfield policy periods. Therefore, Westfield contends, Law Tanning did not sustain any loss at all during those periods.[1]

Law Tanning, in turn, seeks summary judgment on its claim. It contends that the policy renders Westport liable for the entire amount that Draeger stole, less the amount that Draeger eventually repaid.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

The primary issue raised by the present motions is whether Draeger's 17-year theft was a single "occurrence" or was made up of 1,940 separate "occurrences." The parties also raise issues concerning other policy provisions, and Westport raises the issue of whether Draeger's partial repayment prevents Law Tanning from claiming that it suffered any loss during the Westfield policy periods. Because the definition of "occurrence" affects the parties' remaining arguments, I start with that issue.

With respect to all issues, the parties agree that Wisconsin substantive law applies. Under Wisconsin law, a court interpreting an insurance policy must attempt to

---

[1] Westfield has not moved for summary judgment on its counterclaim alleging that Law Tanning breached the policy by failing to cooperate and prematurely filing this suit. Westfield states that it will pursue this counterclaim if I do not dismiss all of Law Tanning's claims pursuant to the current motion for summary judgment. *See* ECF No. 21 at 9.

4

identify the intentions of the parties as expressed by the language of the policy. *Day v. Allstate Indem. Co.*, 332 Wis. 2d 571, 584 (2011). If words or phrases are susceptible to more than one reasonable construction, they are ambiguous. *Id.* at 585. Any ambiguity in the policy is construed in favor of the insured. *Id.*

## A. Definition of "Occurrence"

Westport's policy provides that it will pay for loss resulting directly from theft committed by an employee. Commercial Crime Coverage Form § A.1. The parties agree that any loss caused by Draeger's embezzlement would fall within this provision. However, as is relevant here, the provision applies only to "loss [that the insured sustained] resulting directly from an 'occurrence' taking place during the Policy Period shown in the Declarations . . . which is 'discovered' [by the insured] during the Policy Period shown in the Declarations." *Id.* § A. For purposes of this policy language, "occurrence" is defined as:

> (1) An individual act;
>
> (2) The combined total of all separate acts whether or not related; or
>
> (3) A series of acts whether or not related;
>
> committed by an 'employee' acting alone or in collusion with other persons . . . .

*Id.* § F.17.a. The coverage form states that "[t]he most [Westfield] will pay for all loss resulting directly from an 'occurrence' is the applicable Limit Of Insurance shown in the Declarations." *Id.* § B. The limit of insurance shown in the declarations is $25,000.

Westfield contends that the entirety of Draeger's 17-year theft counts as a single occurrence because the policy defines all acts committed by a single employee, either alone or in collusion with others, as a single occurrence. Law Tanning, in turn, contends

5

that the policy's definition of "occurrence" is ambiguous. Law Tanning notes that the definition joins three items ("individual act," "combined total of all separate acts," and "series of acts") using the word "or," and that therefore it is reasonable to interpret the definition to mean that an occurrence can be any one of these three items. Law Tanning then contends that Draeger's theft consisted of 1,940 individual acts—one act per check—and that therefore it is reasonable to view his theft as consisting of 1,940 "occurrences."

Law Tanning's interpretation is not reasonable because it leads to an absurd result. *Blasing v. Zurich American Ins. Co.*, 356 Wis. 2d 63, 70 (2014) ("insurance policies should be given a reasonable interpretation and not one which leads to an absurd result"); *Olguin v. Allstate Ins. Co.*, 71 Wis. 2d 160, 165 (1976) (same). There is no doubt that Draeger's 17-year scheme comprised either many "separate acts" or one "series of acts," and that therefore it meets the definition of "occurrence" under either prong (2) or prong (3). Under these prongs, the scheme would constitute one "occurrence." According to Law Tanning, however, the scheme could also reasonably be viewed as comprising multiple "individual acts," and therefore could also satisfy the first prong of the definition 1,940 separate times. But accepting this possibility leads to an absurd result: the exact same facts would constitute both one occurrence and many occurrences. This is a contradiction. Either the scheme is one occurrence or it is multiple occurrences; it can't be both simultaneously. *Cf. Ennis v. Western Nat. Mutual Ins. Co.*, 225 Wis. 2d 824, 835 (Ct. App. 1999) (construing insurance policy to avoid absurd result in which person is both insured and uninsured based on the same facts). Thus, the only reasonable interpretation of the policy is one under which "individual act"

means an isolated act of dishonesty by an employee. Under this interpretation, if the employee commits one act of dishonesty and no others, he or she commits an individual act; if the employee commits multiple acts, he or she commits either a number of separate acts or a series of acts. In both cases, there is only one occurrence.

This interpretation is reinforced by reading the definition of "occurrence" as a whole. By defining "occurrence" to include not only an individual act but also the combined total of all separate acts and a series of acts by an employee, the policy makes clear that a single occurrence includes all dishonest conduct by a single employee (or group of colluding employees). Indeed, if Law Tanning's interpretation were accepted, there would be no reason to include prongs (2) and (3) in the definition. If any single act within a set of multiple acts could be taken out of the set and deemed an "individual act," then the definition of "occurrence" would collapse into a single meaning: every act committed by an employee would be a separate occurrence. Thus, to give effect to the entire definition, both an isolated act of employee dishonesty and multiple acts of dishonesty by the same employee must be treated as a single occurrence. *See Day*, 332 Wis.2d at 585 ("An insurance policy is to be construed, whenever possible, 'so as to give a reasonable meaning to each provision of the contract, and [] courts must avoid a construction which renders portions of a contract meaningless, inexplicable or mere surplusage.'").

Law Tanning contends that if Westfield intended to treat isolated acts and multiple acts the same, then it should not have defined "occurrence" to include an individual act. According to Law Tanning, Westfield should have defined "occurrence" as only the combined total of all separate acts or a series of acts. (Br. at 7–8, ECF No.

7

22.) But omitting "individual act" from the list, as Law Tanning suggests, might raise the question of whether an isolated act is covered at all. That is, if the definition mentioned only "separate acts" and "series of acts," then it would be arguable that an employee would have to commit at least two acts before his or her conduct could give rise to an "occurrence." Thus, including "individual act" on the list of occurrences provides additional clarity. In any event, regardless of whether Westfield could have drafted the definition even more clearly than it did, the fact remains that the definition as it stands is susceptible to only one reasonable interpretation. Therefore, it is not ambiguous.

Law Tanning also suggests that the policy defines "occurrence" as both an individual act and multiple acts so that Westfield has the option to use whatever definition results in the least amount of coverage. (Reply Br. at 2, ECF No. 24.) Law Tanning notes that because it purchased a policy with no deductible, Westfield's obligation to pay is minimized by treating all of Draeger's acts as a single occurrence, so that it must pay the policy limit only once. Law Tanning then speculates that if the policy had a per-occurrence deductible, Westfield would be arguing that Draeger actually committed multiple individual acts and therefore multiple occurrences, with the result that Law Tanning would have to pay separate deductibles for every check he wrote. But regardless of whether this is true, the fact remains that the only reasonable interpretation is one in which multiple acts by a single employee are treated as one occurrence. Thus, if the policy had a per-occurrence deductible, and if Westfield had argued that Draeger's scheme consisted of multiple occurrences, then I would have rejected Westfield's argument.

Finally, I note that my interpretation is consistent with those of other courts that have interpreted similar language in commercial-crime policies. *See Wescott Elec. Co. v. Cincinnati Ins. Co.*, 310 F. Supp. 3d 521, 527 (E.D. Penn. 2018) (finding definition identical to Westfield's unambiguous and that employee's "series of acts" in stealing copper wire qualified as a single "occurrence" because they were committed by a single employee); *Bethany Christian Church v. Preferred Risk Mut. Ins. Co.*, 942 F. Supp. 330, 334 (S.D. Tex. 1996) ("This policy language does not . . . distinguish between a single act versus a series of acts. What is critical in the policy language is the sum total of the loss caused by 'dishonest acts committed by an "employee," whether identified or not, acting alone or in collusion with other persons. . . .'"); *Employers Mut. Cas. Co. v. DGG & CAR, Inc.*, 218 Ariz. 262, 264–65 (2008) ("[An employee's] embezzlement, although including a number of thefts, was a 'series of acts,' each one following the other. The policy plainly considers the loss resulting from the embezzlement of a single employee an occurrence, with an attendant $50,000 policy limit. The majority of courts in interpreting similar policy language in corresponding factual situations have so concluded.").

For these reasons, I conclude that Draeger's embezzlement scheme was a single occurrence, and that therefore "all loss" resulting from that scheme is subject to the per-occurrence policy limit of $25,000.

**B.     Whether Law Tanning Incurred Any Loss**

As discussed in the prior section, Law Tanning's recovery for all loss resulting from Draeger's embezzlement is limited to $25,000. But Westfield contends that Law Tanning is not entitled to recover even this amount because Draeger repaid Law

9

Tanning more than he stole during the time period in which Westfield's policies were in force. Draeger stole $568,226.69 during this period, but he has since repaid $711,840.70 by surrendering the funds in his company 401(k) account. Thus, argues Westfield, Law Tanning did not sustain a loss during the policy period.

Westfield's argument is flawed. The policy does not cover only those losses that the insured *sustained* during the policy period. Instead, it covers any loss no matter when it was sustained so long as it was *discovered* during the policy period (or the extended period to discover a loss, which does not apply here) and resulted directly from an occurrence that took place during the policy period. *See* Commercial Crime Coverage Form § A.[2]

Here, it is undisputed that Law Tanning discovered Draeger's embezzlement scheme and the resulting losses in June 2017, which was during Westfield's 2016–17 policy period. Moreover, as just discussed, Draeger's scheme amounted to a single "occurrence." That "occurrence" began in April 2000 and ended in June 2017. Thus, the "occurrence" that caused Law Tanning's entire loss took place, at least in part, during Westfield's 2016–17 policy period. No language in the policy provides that, when a loss is caused by a single occurrence taking place partly during the policy period and partly outside the policy period, Westfield will only pay for that part of the loss that is sustained

---

[2] The full text of this provision appears below:

> Coverage is provided under the following Insuring Agreements for which a Limit Of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place during the Policy Period shown in the Declarations, except as provided in Condition E.1.k. or E.1.l., which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period to Discover Loss Condition E.1.g.

Commercial Crime Coverage Form § A.

during the policy period. To the contrary, other provisions of the policy confirm that the entire loss will be covered so long as the occurrence took place partly within the policy period. Specifically, Condition E.1.k.(1) sets out a procedure for settling a loss that resulted from an "occurrence" taking place partly during the policy period and partly during the policy period of prior insurance.[3] Because Westfield could not settle a loss unless it was covered by the policy, this provision shows that a loss will be covered even if it was caused by an occurrence taking place partly during and partly outside the policy period.[4]

---

[3] This condition states:

> If you "discover" loss during the Policy Period shown in the Declarations, resulting from an "occurrence" taking place:
>
> (a) Partly during the Policy Period shown in the Declarations; and
>
> (b) Partly during the policy period(s) of any prior cancelled insurance that we or any affiliate issued to you or any predecessor in interest;
>
> and this insurance became effective at the time of cancellation of the prior insurance, we will first settle the amount of loss that you sustained during this policy period. We will then settle the remaining amount of loss that you sustained during the policy period(s) of the prior insurance.

Commercial Crime Coverage Form § E.1.k.(1).

[4] It is true that Condition E.1.k.(1) applies only when the prior policy was issued by Westfield or one of its affiliates. But this does not alter the underlying point that a loss will be covered in full even if it was caused by an occurrence taking place partly outside the policy period. No part of the policy extends coverage to losses caused by an occurrence taking place partly during a prior Westfield policy period. Rather, Condition E.1.k.(1) assumes that a loss caused by an occurrence taking place partly outside the policy period is already covered by the applicable insuring agreement (which in this case is § A.1 of the commercial-crime form) and merely provides a settlement procedure to use when a prior Westfield policy happened to be in effect during the prior period. In contrast, another subpart of Condition E.1.k., in addition to providing a settlement procedure, expressly *extends* coverage to a loss that the insured sustained from an occurrence taking place entirely during a prior Westfield policy period but that the insured did not discover until the current Westfield policy period. *See* Condition E.1.k.(2). This difference shows that the coverage discussed in Condition E.1.k.(1) must have been conferred by another policy provision. Here, that is § A.1 of the commercial-crime form.

Because Westfield's 2016–17 policy covers all losses caused by Draeger's scheme no matter when they were sustained (subject to the $25,000 policy limit), Draeger's partial repayment did not eliminate Law Tanning's right to recovery. Draeger stole a total of $2,850,111 from Law Tanning between August 2000 and June 2017 but repaid only $711,840.70. Thus, Law Tanning sustained an actual net loss of $2,138,270.30 directly from a single occurrence that took place and was discovered during Westfield's 2015–16 policy period.

**C.     Remaining Arguments**

In their briefs, the parties raise other arguments involving other policy provisions. First, Westfield contends that Law Tanning cannot recover under Westfield's 2015–16 policy because Draeger's scheme was discovered during the 2016–17 policy period. This argument is effectively moot, since no separate "occurrence" took place during the earlier policy year and Law Tanning has not argued that it is entitled to "stack" coverages from the two policy years and apply them both to a single occurrence.

Second, Westfield contends that its policy does not cover any occurrences that took place entirely within the policy periods of policies issued by Law Tanning's prior insurer, Frankenmuth Mutual. Again, however, it is unnecessary to consider this argument because I have found that this case involves only one occurrence and Law Tanning has not argued that it is entitled to stack coverages from multiple policies.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that Law Tanning's motion for summary judgment is **DENIED**.

**IT IS FURTHER ORDERED** that Westfield's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted as to Westfield's claim that the most Law Tanning can recover under the policy is $25,000. The motion is denied as to Westfield's claim that Law Tanning did not suffer any covered loss at all.

**FINALLY, IT IS ORDERED** that a telephonic status conference will be held on **January 15, 2019 at 11:00 a.m.** to schedule further proceedings on Westfield's counterclaim alleging that Law Tanning breached the policy by failing to cooperate and by prematurely commencing this suit.

Dated at Milwaukee, Wisconsin, this 6th day of December, 2018.

s/Lynn Adelman
LYNN ADELMAN
District Judge